ORIGINAL

FILED IN CHAMBERS
U.S.D.C. Atlanta

JAN 13 2020

JAMES N. HATTEN, Clerk
By: *[signature]*

# United States District Court

NORTHERN DISTRICT OF GEORGIA

UNITED STATES OF AMERICA

v.

IVAN VAN BEVERHOUDT

**AMENDED CRIMINAL COMPLAINT**

Case Number: 1:20-MJ-17

I, the undersigned complainant being duly sworn, state the following is true and correct to the best of my knowledge and belief. On or about January 10, 2020 in Clayton County, in the Northern District of Georgia, defendant did knowingly and intentionally posses with the intent to distribute a controlled substance, said act involving at least 5 kilograms of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance,

in violation of Title 21, United States Code, Section(s) 841(a)(1) and 841(b)(1)(A).

I further state that I am a(n) Special Agent and that this complaint is based on the following facts:

PLEASE SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof.   Yes

_____
Signature of Complainant
Antonio P. Edwards

Based upon this complaint, this Court finds that there is probable cause to believe that an offense has been committed and that the defendant has committed it. Sworn to before me, and subscribed in my presence

January 13, 2020                              at   Atlanta, Georgia
Date                                               City and State

JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE          _____
Name and Title of Judicial Officer                Signature of Judicial Officer
AUSA Elizabeth M. Hathaway

## AFFIDAVIT IN SUPPORT OF COMPLAINT

I, Antonio P. Edwards, a Special Agent (SA) with Homeland Security Investigations (HSI), Immigration and Customs Enforcement (ICE), depose and say under penalty of perjury:

1. This affidavit is submitted in support of a criminal complaint for Ivan VAN BEVERHOUDT.

2. As set forth herein, I respectfully submit there is probable cause to believe that on or about January 10, 2020, in the Northern District of Georgia, Ivan VAN BEVERHOUDT did knowingly and intentionally possess with intent to distribute a controlled substance, said act involving at least 5 kilograms of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A).

## AGENT BACKGROUND

3. I am currently assigned to the Border Enforcement Security Task Force at Hartsfield-Jackson Atlanta International airport (Port of Entry 1704). Among my responsibilities, I am empowered by law to investigate and to make arrests for offenses involving assaults on federal employees and officers carrying out their duties at the airport.

4.  Prior to working for HSI, from March 2008 to March 2012, I served as a Special Agent for the United States Army Criminal Investigation Command, Computer Crime Investigative Unit (CCIU), Fort Belvoir, Virginia. While employed at CCIU, I was responsible for the investigation of violations pertaining to computer intrusions and to other types of malicious computer activity directed against the U.S. Army.

5.  From November 2007 to November 2008, I served as a Special Agent with the Department of Commerce, Bureau of Industry and Security (BIS), Office of Export Enforcement. At BIS, I was responsible for enforcing federal laws relating to the unlawful export of goods and technology from the United States.

6.  I am a graduate of the Federal Law Enforcement Training Center's Criminal Investigator Training Program. While at FLETC, I received training in violations of criminal and immigration law to include, but not limited to, investigations pertaining to money laundering and narcotics. Additionally, I received a Juris Doctorate from Indiana University in May 2003, and I was subsequently admitted to the Indiana bar where from August 2003 to October 2006, I was employed as a Deputy Prosecutor for Morgan County. Additionally, I served as a Judge Advocate General in the U.S. Army National Guard, District of Columbia, for approximately 11 years.

7.  As an HSI SA, I have investigated federal criminal violations and related offenses, including, but not limited to, violations of Title 31, United States Code, Section 5332, Title 21, United States Code, Sections 841, 846, 952, 960 and 963, and Title 18, United States Code, Sections 1956, 1957, and 1960. My training and experience in narcotics enforcement includes the identification of narcotics, including cocaine, methamphetamine, heroin, MDMA (ecstasy) and marijuana, and the investigation of persons in possession of narcotics for purposes of sales and transportation, as well as persons conspiring to transport and sell narcotics. I confer regularly with narcotics investigators at the federal, state and local level, sellers and transporters of narcotics, and informants regarding the manner in which narcotics are manufactured, packaged for sale, stored, concealed, sold and transported.

## Sources of Information

8.  This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. The information contained in this affidavit is based upon my personal knowledge and observation, my training and experience, conversations with other law enforcement officers and witnesses, and the review of documents and records.

9.     I have endeavored to make clear which facts stated in this affidavit are based upon my own personal observations and which are not. Unless otherwise noted, factual statements not based upon my personal observations are based upon information received from one or more other law enforcement officers who may have either direct or hearsay knowledge of the factual statement, such knowledge having been conveyed to me either personally or through a report that I have reviewed. Wherever in this affidavit I state my belief, such belief is based upon my training and experience and the information obtained through this investigation.

## PROBABLE CAUSE

10.    On January 10, 2020, while assisting the HSI/ICE duty agent for Hartsfield-Jackson Atlanta International Airport (HJAIA), Port of Entry 1704, I was contacted by Customs and Border Protection Officer (CBPO) Shon Jenkins to respond to the discovery of 17.90 Kilograms grams of cocaine found in bags belonging to CBPO Ivan VAN BEVERHOUDT who was traveling to visit the United States (US) from Saint Thomas, US Virgin Islands, in an unofficial capacity. Upon arrival, I spoke with CBPO Jenkins who provided me with the following information.

11.    On January 10, 2020, CBPO Ariel Amador Lopez and CBPO Tighe McIntyre were working HJAIA pre-cleared Delta flight DL 571 from Saint

Thomas, US Virgin Islands, in the Jet-way at Terminal F-3 with K-9 handler CBPO Palombo when they observed VAN BEVERHOUDT with a red roller bag and a black hand[1] bag entering the jet-way exiting the flight. K-9 Officer Palombo was working with his CBP assigned K-9 Anti, in the Jet-way to inspect exiting passengers and their bags. As VAN BEVERHOUDT and his bags passed K-9 Anti, the dog alerted to VAN BEVERHOUDT and his bags. CBPO Lopez approached VAN BEVERHOUDT and his bags and attempted to move the red roller bag away from K-9 Anti when CBPO Lopez immediately noticed the bag was heavy and stopped moving the red roller bag. Officers then decided to advise VAN BEVERHOUDT to wait in jet-way with the officers until the flight was cleared. While VAN BEVERHOUDT was waiting CBPO Lopez observed VAN BEVERHOUDT pacing back and forth in the jet way in a nervous manner. CBPO Lopez attempted to calm VAN BEVERHOUDT down and began to question VAN BEVERHOUDT further about VAN BEVERHOUDT travels; however, VAN BEVERHOUDT was non-responsive and would not answer CBPO Lopez questions. Upon completion of their inspection of Delta flight DL 571, CBP

---

[1] VAN BEVERHOUDT had carried on both bags to the flight from St. Thomas to HJAIA.

Officers then escorted VAN BEVERHOUDT to the CBP interview room located at Terminal F-3.

12. At the CBP interview room, CBPO McIntyre and CBPO Richard Stephens began to question VAN BEVERHOUDT about his travel. VAN BEVERHOUDT explained to the officers that he was traveling to Baltimore. CBPO McIntyre then asked VAN BEVERHOUDT why VAN BEVERHOUDT was traveling to Baltimore and VAN BEVERHOUDT responded, stating that he was traveling to Baltimore to see a doctor, because he was experiencing chest pains. CBPO McIntyre asked VAN BEVERHOUDT what kind of doctor he was going to see and if he had an appointment. VAN BEVERHOUDT replied that he did not know what kind of doctor and he did not have an appointment yet. CBPO McIntyre then asked why was he traveling on a Friday night to see a doctor on the weekend without an appointment or what type of doctor to see, and VAN BEVERHOUDT became evasive, avoiding directly answering the question with a prolonged pause, and then replied that he did not know. CBPO McIntyre asked VAN BEVERHOUDT how long he was planning to stay in Baltimore, and VAN BEVERHOUDT replied, until this Sunday (01/12/2020). CBPO McIntyre stated that it usually takes a few weeks to get an appointment, and VAN BEVERHOUDT stated that he was not sure about how long it would take. CBPO Stephens then

6

asked VAN BEVERHOUDT where he was going to stay while in Baltimore, and VAN BEVERHOUDT replied that he would be staying at the Hilton by the airport in Baltimore, but VAN BEVERHOUDT would not provide any further details pertaining to his reservation.

13.     CBPO Stephens then asked VAN BEVERHOUDT what kind of work he does, and VAN BEVERHOUDT replied that it was the same kind of work [CBPO Stephens] does. When CBPO Stephens asked whether VAN BEVERHOUDT works for U.S. Customs and Border Protection, VAN BEVERHOUDT replied yes. CBPO Stephens then asked VAN BEVERHOUDT if he had his credentials, and VAN BEVERHOUDT replied yes. CBPO Stephens then asked VAN BEVERHOUDT if he could see the credentials, and VAN BEVERHOUDT removed his U.S. Government credentials from his pocket and handed them to CBPO McIntyre, who verified that they were CBP credentials. CBPO Stephens then asked VAN BEVERHOUDT whether he had ever been to Baltimore before and VAN BEVERHOUDT replied yes. CBPO Stephens asked when he was last in Baltimore, and VAN BEVERHOUDT replied that it was a couple of months ago.

14.     CBPO Jenkins instructed CBPO Palombo to again run K9-Anti over both of VAN BEVERHOUDT's carry-on bags, and K9-Anti sat in front of the

7

bags indicating an alert. CBPO McIntyre asked VAN BEVERHOUDT what was in the bag, and VAN BEVERHOUDT said that he did not know what was in the bag. CBP Officers then decided to take VAN BEVERHOUDT downstairs to Terminal F baggage inspection area to continue their inspection.

15. Officers escorted VAN BEVERHOUDT to the CBP interview room on Terminal F. In the interview room, VAN BEVERHOUDT's bags were placed on the table and officers attempted to obtain a declaration for both of VAN BEVERHOUDT's bags. VAN BEVERHOUDT explained that he put his bags in the overhead compartment of the plane while traveling and, when VAN BEVERHOUDT exited the plane, he picked up bags that looked like his red roller bag and his black hand bag.

16. Subsequently, CBPO Lopez and CBPO McIntyre opened VAN BEVERHOUDT's red roller bag and located 14 bricks of what appeared to be cocaine, as well as items of clothing and toiletries. Some of the suspected cocaine bricks were marked or labeled on their wrapper with "V-03."

17. CBPO Jenkins and CBPO Lopez immediately began placing VAN BEVERHOUDT into handcuffs, at which time CBPO Jenkins felt a firearm on VAN BEVERHOUDT's right side in what appeared to be a holster. SCBPO

8

Jenkins then quickly removed the firearm and the holster and handcuffed VAN BEVERHOUDT.

18. CBPO MCINTYRE then searched VAN BEVERHOUDT's black hand bag and located two bricks of what appeared to be cocaine. On brick was marked or labeled on its wrapper with the same "V-03" logo observed on the wrappers of bricks identified in VAN BEVERHOUDT's red roller bag.

19. At approximately 7:12 p.m., CBPO McIntyre conducted a field test of some of the bricks from inside VAN BEVERHOUDT's bags, which provided positive results for the presence of Cocaine Hydrochloride.

20. CBPO Lopez and CBPO McIntyre moved VAN BEVERHOUDT to a pat-down room where they completed a pat-down of VAN BEVERHOUDT. In the pat-down room, CBPO McIntyre identified a set of handcuffs, which were in VAN BEVERHOUDT's back pocket. CBPO McIntyre asked VAN BEVERHOUDT if he had handcuff keys. VAN BEVERHOUDT stated that his handcuff keys were in his black hand bag. CBPO McIntyre later searched the side pocket of the black hand bag and located a key ring with numerous keys, including a handcuff key, and VAN BEVERHOUDT's U.S. Passport. During the pat-down, CBPOs also found a total of $571.25 in U.S. Currency located in VAN BEVERHOUDT's front pocket.

21.     CBPOs escorted VAN BEVERHOUDT to an interview room at CBP Terminal F where VAN BEVERHOUDT was met by SA Edwards, SA Bryan Haley, HSI/ICE, and SA Jarrod Winkle, Department of Homeland Security, Office of the Inspector General. Agents provided VAN BEVERHOUDT with his Miranda warning Statement of Rights, and his Garrity advisement. VAN BEVERHOUDT signed both advisements and waived his rights.

22.     Agents asked VAN BEVERHOUDT about his travel. VAN BEVERHOUDT explained to the officers that he was traveling to Baltimore, and that he has traveled to Baltimore on more than one occasion, and to Florida in the past to visit family members. VAN BEVERHOUDT could not provide exact dates. (Travel records indicate that VAN BEVERHOUDT traveled to the US six times since March 1, 2018). VAN BEVERHOUDT explained that he was traveling to Baltimore to see a doctor because he had allergies and chest pains while in Saint Thomas and wanted to visit the United States to see a doctor after visiting a doctor in Saint Thomas. When Agents asked VAN BEVERHOUDT if he had an appointment and a referral to a specialist in the United States that merited traveling to Baltimore, VAN BEVERHOUDT replied he did not know what kind of doctor he needed; he did not have an appointment with any particular doctor in Baltimore or any particular city; he planned to just walk in to a doctor (although it

was a weekend); and his travel to Baltimore was short such that VAN BEVERHOUDT would return to Saint Thomas on Sunday, January 1, 2020. When asked about that travel from the perspective a trained CBPO familiar with short-duration travel patterns that often involve drug smuggling, VAN BEVERHOUDT was evasive and did not answer.

23.   Agents asked VAN BEVERHOUDT to explain his travel preparation and the bags that he brought on this trip to the United States. VAN BEVERHOUDT explained that he packed a red roller bag and a black computer hand bag the morning of his travel, and that he brought both bags with him to the airport. VAN BEVERHOUDT explained at the airport in Saint Thomas he checked in with the airlines using his CBP credentials as an armed law enforcement officer (LEO) because he was carrying his assigned CBP weapon(s) and equipment, signed in with Transportation Security Administration (TSA) as a LEO flying armed (which meant he bypassed the TSA screening checkpoint), and arrived at his flight to the United States when the flight was already boarding. VAN BEVERHOUDT explained that he boarded the plane and put his bags in the overhead compartment of the plane above the seat he sat in while traveling. VAN BEVERHOUDT clarified that he sat in the window seat of the row behind his assigned seat and was confronted by the man who was assigned the seat, but they

11

agreed to stay in those seats. VAN BEVERHOUDT did not know the man's name, nor could he describe the man. VAN BEVERHOUDT then explained that when he exited the plane, he retrieved the red roller bag and the black hand bag from the overhead compartment above him and left the airplane. As VAN BEVERHOUDT left the plane, he stated that he was instructed to have his passport out for CBP and that he retrieved his passport.[2]

24. Agents then asked VAN BEVERHOUDT the following questions emphasizing VAN BEVERHOUDT's training and experience as a CBPO. When asked about the likelihood of two identical bags being in the overhead directly above him, VAN BEVERHOUDT could not provide an answer. When asked about the likelihood of anyone letting VAN BEVERHOUDT walk away with two of their bags containing this many bricks of cocaine, VAN BEVERHOUDT could not provide an answer. When asked about his passport and handcuff key recovered in his black hand bag where cocaine was also located, VAN BEVERHOUDT could

---

[2] As previously described, when CBPOs could not find VAN BEVERHOUDT's handcuff key during the search of his person, CBPOs asked VAN BEVERHOUDT the location of his handcuff key and VAN BEVERHOUDT directed CBP to his black hand bag. Officers located VAN BEVERHOUDT's handcuff (along with his passport) in the side pocket of the black hand bag.

not provide an answer. When asked why VAN BEVERHOUDT did not immediately bring the bag discrepancy to the attention of the CBPOs present when he encountered them, VAN BEVERHOUDT did not provide an answer.

**END OF AFFIDAVIT**