# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| ) | |
| **v.** ) | No.: 1:20-CR-00058-JPB-RDC |
| ) | |
| **IVAN VAN BEVERHOUDT,** ) | |
| ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## MOTION TO SUPPRESS

COMES NOW the Defendant, Ivan Van Beverhoudt (hereinafter "Van Beverhoudt"), by and through undersigned counsel, pursuant to Fed.R.Crim.P. 12(b)(3)(C), moves this Court for an evidentiary hearing, and an order suppressing all evidence of any kind and the fruits thereof – including alleged physical evidence, statements, identification, and testimony—illegally seized by law enforcement agents in violation of Defendant's Fourth, Fifth, Sixth or Fourteenth Amendment rights, or Fed.R.Crim.P. 41.

As grounds thereof, Defendant alleges that the seizure and search of Van Beverhoudt's person, and the seizure of items resulting from that search, were improper, illegal, and without probable cause, in violation of Defendant's rights

under the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution:

Specifically, the accused moves for the suppression and exclusion of the following:

1. Any and all property, papers, or information pertaining to Mr. Van Beverhoudt, obtained or taken from him, on or about January 10, 2020, and at any time thereafter, by CBPO, or by any other person acting in concert with them.

2. Any statements made by Mr. Van Beverhoudt, signed or unsigned, or any oral statements or confessions made by Mr. Van Beverhoudt – all which are fatally tainted by, *inter alia*, in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and the Fifth Amendment.

3. Any and all other property, papers, information, or testimony pertaining to Mr. Van Beverhoudt obtained as the fruit of the illegal search, seizure, detention, interrogation, and arrest that occurred on or about January 10, 2020.

In particular Movant avers that

i. Because the canine sniff of Mr. Van Beverhoudt's person was overly intrusive and in violation of the Fourth Amendment, any and all evidence obtained therefrom requires suppression.

    ii.    The canine sniff was performed by an unreliable canine, prone to error and could not provide the reasonable suspicion for a nonroutine seizure of Mr. Van Beverhoudt, any and all evidence seized must be suppressed.

    iii.    Mr. Van Beverhoudt was illegally seized as soon as he was ordered to remain with law enforcement officers, and interrogated.  From that point forward before ever receiving *Miranda* warnings – all statements obtained by CBPO are due to be suppressed.

    iv.    The asportation of Mr. Van Beverhoudt by CBPO from the jetway to the interview room, following the unlawful search by the K9, amounted to an illegal arrest – requiring suppression of any evidence obtained by CBPO.

    v.    Anything seized as a result of the illegal arrest, including, but not limited to, statements made by Mr. Van Beverhoudt, any contraband, and/or phones are fruit of the poisonous tree and must be suppressed.

    vi.    Independent of the canine sniff, the interrogation of Mr. Van Beverhoudt was in violation of the Fifth Amendment and *Miranda v. Arizona*, 384 U.S. 436 (1966) and must be suppressed.

## PRELIMINARY STATEMENT OF FACTS

On January 10, 2020, Mr. Ivan Van Beverhoudt, travelling from the U.S. Virgin Islands to Baltimore, Maryland, landed at Hartsfield-Jackson International Airport ("Airport") in Atlanta, Georgia, to catch his connecting flight to Baltimore.

While heading down the jetway from the aircraft, Mr. Van Beverhoudt was approached by a CBP Officer who allowed his canine to perform an intrusive search of Mr. Van Beverhoudt's person. While attempting to continue on his way, Mr. Van Beverhoudt was ordered by CBPO J. Amador Lopez to stop and to wait with officers until the flight cleared. Once the flight was cleared, Mr. Van Beverhoudt was "escorted" to a "secure" interview room located at Gate F, where audio and video recordings were set up to record the interrogation of Mr. Van Beverhoudt by CBP Officers. While in the interview room, CBPO Lopez, CBPO Tighe P. McIntyre, and CBPO R. Stephens asked Mr. Van Beverhoudt a serious of questions relating to his travel and the contents of the black and red bags that were confiscated by CBPO; including, *inter alia*, the following

   I. Questions asked by CBPO McIntyre:

   a. Why are you traveling to Baltimore?

   b. What kind of doctor are you going to see, and do you have an appointment?

   c. How long are you staying in Baltimore?

   d. Do the bags you were carrying belong to you?

   e. What is in the bag?

   II. Questions asked by CBPO R. Stephens:

   a. Are you going to stay while in Baltimore?

   b. So you work for U.S. Customs and Border Protection?

      c. May I see your credentials?

      d. Have you ever been to Baltimore before?

      e. When was the last time you traveled to Baltimore?

III.   Questions asked by CBPO Lopez:

      a. Why didn't you answer my questions in the jetway?[1]

After the initial encounter in the jetway Movant was "escorted" back down to Concourse F baggage area so the CBP Officers could continue the inspection. Once the inspection was complete, Movant was escorted back to the interview room, where the interrogation continued by CBPO McIntyre. During this time, CBPO McIntyre opened the red bag and removed the contents from the bag. When the items became visible, Supervisor CBPO Shon Jenkins ordered CBPO McIntyre to "cuff" Mr. Van Beverhoudt. Approximately 20 minutes after Mr. Van Beverhoudt was handcuffed, CBPO McIntyre and CBPO Lopez completed a pat down in the search room. *After* approximately two hours of being interrogated by CBP Officers, Mr. Van Beverhoudt was *Mirandized*. However, at no time before the interrogation or during the interrogation was Movant Mirandized – even when his statements went from benign to increasingly inculpatory –and at no point did the CBP Officers inform Mr. Van Beverhoudt that he was free to leave.

---

[1] While Mr. Van Beverhoudt was waiting in the jetway with law enforcement, after having been seized, CBPO Lopez asked Mr. Van Beverhoudt questions regarding his travel. However, Mr. Beverhoudt did not respond. Mr. Van Beverhoudt's silence was a de facto exercise of his 5th Amendment right to remain silent.

For these reasons, and other described in more detail below, Mr. Van Beverhoudt's statements were not made knowingly and voluntarily, they were elicited in violation of his Constitutional rights and should be suppressed

## ARGUMENT

**I. THE K9 INSPECITON OF MR. VAN BEVERHOUDT'S PERSON WAS OVERLY OFFENSIVE AND AMOUNT TO AN UNREASONABLE SEARCH IN VIOLATION OF THE FOURTH AMENDMENT.**

The Fourth Amendment requires that all searches and seizures of "persons, houses, papers, and effects" be reasonable. U.S. Const. Amend. IV. "Where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, …reasonableness generally requires the obtaining of a judicial warrant" supported by probable cause." *United States v. Vergara,* 884 F.3d 1309, 1312 (11th Cir. 2018) (quoting *Riley v. California*, 134 S. Ct. at 2482) ;*Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995); see *New Jersey v. T.L.O.,* 469 U.S. 325. However, the Supreme Court has recognized situations that render obtaining a warrant impractical and has designed several exceptions to the warrant and probable cause requirements of the Fourth Amendment. *Riley v. California*, 134 S. Ct. at 2482.

One such exception to the warrant requirement is the so-called "border search." The traditional tension under the Fourth Amendment between the interests of the Government and the privacy right of the individual generally favors the

government at the border. *Almeida-Sanchez v. United States*, 413 U.S. 266, 273 (1973). In *United States v. Flores-Montano*, 541 U.S. 149 (2004), the Supreme Court noted that, as an incident to national security, custom and border searches, that are *routine* in nature, do not violate the Fourth Amendment. Therefore, "routine searches" of a person and his or her effects crossing an international border into the United States are not generally subject to any requirement of reasonable suspicion that an item contains contraband or evidence of criminal activity. See e.g., *United States v. Ramsey*, 431 U.S. 606 (1977). On the other hand, however, the government's need to conduct searches at the border without a warrant is not unlimited. Particularly, a "nonroutine" search, involving either an "intrusive search of the body, a particularly destructive search of property, or a search conducted in a particularly offensive manner," requires "reasonable suspicion" because the search is considered more invasive. *United States v. Arnold*, 533 F.3d 1003, 1007-08 (9th Cir. 2008); *See also Montoya de Hernandez*, 473 U.S. at 541. Nevertheless, a "routine" search evolves into "nonroutine" if the search is either particularly offensive, including an intrusive search of the body, or is physically destructive. *Id*.

    To determine whether a search is so intrusive as to require heightened suspicion, courts consider how the intrusive search will undermine a person's dignity and how much information about the person the search will reveal. *United States v. Vega-Bravo*, 729 F.2d 1341, 1345–49 (11th Cir. 1984) (concluding a person retains

his or her dignity during an x-ray, but reveals sensitive information, and therefore reasonable suspicion is required to perform the search).

Here, Mr. Van Beverhoudt was subject to an overly offensive K9 inspection as he traveled the jetway after departing the aircraft. While the jetway sat at full capacity (with little to no wiggle room) – and its parameters guarded by Custom and Border Patrol Officers and a K9 team – the canine aggressively intruded onto Mr. Van Beverhoudt's personal areas, leaving him with no chance of avoiding the K9 contact.

The CBP Officers' failure to conduct a proper K9 inspection amounted to an unlawful search, and, as such, violated the Fourth Amendment.

Any purported "routine" search quickly morphed into a nonroutine search – when the handler of the K9 allowed it to search Mr. Van Beverhoudt in the offensive manner described above – and any evidence seized from the unlawful search is due to be suppressed.

II. **ALL EVIDENCE OBTAINED FROM MR. VAN BEVERHOUDT'S UNLAWFUL SEARCH IS A FRUIT OF THAT SEARCH AND MUST BE SUPPRESSED.**

Where illegality is established for a search, by, for instance, violating the Fourth Amendment, all evidence seized from that search by exploitation of that illegality is "fruit of the poisonous tree," unless the evidence was obtained by, "…means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*,

371 U.S. at 488. Here, as discussed above, CBPO Lopez's K9 inspection on Mr. Van Beverhoudt's person was so intrusive that it rose to the level of a search under the Fourth Amendment. As a direct result of this illegal search, CBPO Lopez sought incriminating information from Mr. Van Beverhoudt.

Because the only means by which Officer Perez obtained the evidence (i.e., statements), was through the illegality of the search, the evidence seized from Mr. Van Beverhoudt was obtained in violation of the Fourth Amendment and must be suppressed as the "fruit of the poisonous tree." *Id*. at 486.

### III. THE ALLEGED STATEMENTS MUST BE SUPPRESSED AS THEY WERE OBTAINED IN VIOLATION OF MR. VAN BEVERHOUDT'S FIFTH AMENDMENT RIGHTS AS SET FORTH IN MIRANDA V. ARIZONA.

Where a defendant is in custody and subject to interrogation, or its functional equivalent, he must be clearly informed that he has the right to remain silent, the right to have counsel present, and that any statement he makes may be used as evidence against him. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *see Garcia v. Singletary,* 13 F.3d 1487, 1489 (11th Cir.1994) ("A 'custodial interrogation' occurs whenever law enforcement officers question a person after taking that person into custody or otherwise significantly deprive a person of freedom of action.") (*citing Miranda,* 384 U.S. at 444, 86 S.Ct. 1602). If he is not informed of these rights, any statements made during the interrogation cannot be used against him. *Id*. One is in custody once an investigating officer physically deprives a suspect of his freedom

of action in any significant way or reasonably leads the suspect to believe that he cannot leave. *Id*. The functional equivalent of interrogation occurs when a law enforcement officer uses words or actions that the officer knows are reasonably likely to elicit an incriminating response. *Rhode Island v. Innis*, 446 U.S. 291,301 (1980).

   1. Custody

Mr. Van Beverhoudt was in custody from the moment he was stopped by CBPO officers at Hartsfields-Jackson because he was not free to leave CBPO's presence or the interrogation. Thus, Mr. Van Beverhoudt had no choice but to comply with the CBP Officer's order. "Custody for *Miranda* purposes is a state of mind. When police create a situation in which a suspect reasonably does not believe that he is free to escape their clutches, he is in custody and, regardless of their intentions, entitled to *Miranda* warnings." *United States v. Slaight*, 620 F.3d 816, 820 (7th Cir. 2010); *see United States v. Harrold*, 679 F. Supp. 2d 1336, 1343 (N.D. Ga. 2009); *Miranda v. Arizona*, 384 U.S. 436 (1966).

As part of this interview process, Mr. Van Beverhoudt was clearly detained – he was not allowed to leave the CBPO area, he was held and questioned by more than three CBPO officers, he was not told the process or questions were voluntary, and he was not given his *Miranda* warnings. *United States v. Harrold*, 679 F. Supp. 2d 1336, 1343 (ND Ga. 2009).

When evaluating whether a defendant is in "custody," for the purpose of *Miranda*, courts should examine factors including the location of the questioning, its duration, statements made during the interrogation, the presence of absence of physical restraints during the questioning, and the release of the interviewee at the end of questioning. *Harrold*, 679 F. Supp. 2d 1336, 1343 (ND Ga. 2009).

In *Harrold*, the Court largely considered the totality of circumstances to determine whether a suspect was in custody for purpose of *Miranda*. In determining whether that person was in custody at the time law enforcement officers interrogated her, the Court analyzed the following facts:

> "Glass went to the station voluntarily after seeing her photograph on the news; Glass was not told that she was not under arrest or that she was free to leave; Glass was locked in an interview room while waiting for the agents to start the interview; Glass' wallet and her identification were taken from her at some point prior to the interview; Glass was not restrained and the interview room door was unlocked during the interview; and Glass was not told that she was under arrest or could not leave until the conclusion of the interview.

Accordingly, the court held that, "given these circumstances, a reasonable person would not have felt free to terminate the interrogation and leave. "*Harrold*, 679 F. Supp. 2d 1336, 1344 (ND Ga. 2009); *see United States v. Borostowski*, 775 F.3d at 855 citing *United States v. Ambrose*, 668 F.3d 943, 956 (7th Cir. 2014) (in determining whether a person is in custody, a court should consider, among other things, whether the encounter occurred in a public place, whether the suspect consented to speak with officers, whether the officers informed the suspect that he

was not under arrest, whether the interviewee was moved to another area, whether there was a threatening presence of several officers and a display of weapons or physical force, whether the officers deprived the suspect of documents needed to depart, and whether the officers' tone was such that their requests were likely to be obeyed).

While framing the process as a routine inspection, officers escorted Mr. Van Beverhoudt to an interrogation room equipped with audio and visual recording equipment for the purpose of eliciting an incriminating statement that was recorded. During this phase of the interrogation, multiple officers and a table were between Mr. Van Beverhoudt and the door. Although agents never placed handcuffs or formally arrested Mr. Van Beverhoudt prior to questioning him, he was held in a room, never told he was free to leave, nor did the officers give him the option of contacting anyone. The interview lasted approximately two hours, and, as noted above, questioning continued in various forms at various locations. At the end of the final interrogation, Mr. Van Beverhoudt was not released, but arrested. Any conclusion than the interview was custodial is inescapable. *Harrold*, 679 F. Supp. 2d 1336, 1343 (ND Ga. 2009); *see also Borostowski*, 775 F.3d 851, 853 (7th Cir. 2014) (finding that a reasonable person in defendant's situation would not have felt free to end encounter with law enforcement officers and leave, and thus defendant was "in custody" for purpose of *Miranda*; although the encounter occurred in

defendant's home, defendant had been told that he was not under arrest or in custody, and the tone of questioning had not been hostile or combative, encounter was not voluntary, there was strong police presence, defendant had been restrained by de facto two-man guard, interrogation was extended in length, and he had been confined to a small crowded room).

In *Slaight*, the Court placed great weight on the fact that law enforcement felt they had enough probable cause to charge the defendant prior to interrogating him. *Slaight* at 822 ("And the more than likelihood that he would be formally placed under arrest if he tried to leave because the government already had so much evidence against him. These facts are incontrovertible and show that the average person in Slaight's position would have thought himself in custody. Any other conclusions would leave *Miranda* in tatters."). The same is true in Mr. Van Beverhoudt's case. Agents appear to have fully believed, based on the information in the complaint, that they had enough probable cause to charge Mr. Van Beverhoudt the moment K9 Anti alerted to Mr. Van Beverhoudt's luggage. Thus, instead of properly arresting and *Mirandizing* Mr. Van Beverhoudt, as they eventually intended to do, CBPO officers chose to conduct a series of ruse interviews of him, starting with the "routine" CBPO detention and questioning.

This is a clear violation of not only the "spirit" of *Miranda* but the letter of that decision. See generally *Harrold*, 679 F. Supp. 2d 1336, 1343 (N.D. Ga. 2009).

All statements Mr. Van Beverhoudt made prior to receiving his *Miranda* warnings must be suppressed. A contrary result would destroy the effect and import of *Miranda* as it now stands.

2. Interrogation

"Interrogation" in this context simply means, asking a defendant questions or using other tactics designed to elicit an incriminating statement. *United States v. Lopez–Garcia,* 565 F.3d 1306, 1317 (11th Cir.2009); *see Brewer v. Williams*, 430 U.S. 387 (1977) (law enforcement banter designed to appeal to defendant's religious nature was designed to elicit an incriminating statement such that the statement was properly suppressed). To take the less complicated issue first, Mr. Van Beverhoudt was subject to nearly constant interrogation for approximately two hours, from the time he was escorted from the jetway to the interview room.  Starting with the CBPO officers patrolling the jet terminal and continuing with another set of CBPO officers in the interviewing room located at F3 gate, Mr. Van Beverhoudt was peppered with questions about the purpose of his trip to the U.S. mainland and what he intended to do after potentially reaching his destination. As such, Mr. Van Beverhoudt was subject to interrogation from the minute he was approached by law enforcement at Hartsfield-Jackson airport.

## **CONCLUSION**

Accordingly, the Fourth and Fifth Amendments of the United States Constitution, along with the exclusionary rule, mandate that any and all evidence seized from Mr. Van Beverhoudt, including any statements, may not be introduced at trial because such evidence is the direct product of an unlawful detention. Further, all statements must be suppressed as violative of the Fifth Amendment. All physical evidence and statements secured by CBPO at Hartsfield-Jackson International Airport on January 10, 2020, must be excluded from the evidence at trial.

This 9th day of July 2020.

                                            Respectfully submitted,

                                            /s/ Bruce S. Harvey
                                            LAW OFFICE OF BRUCE S. HARVEY
                                            ATTORNEY FOR DEFENDANT
                                            Bruce S. Harvey, #335175
                                            bruce@bharveylawfirm.com
                                            146 Nassau Street, NW
                                            Atlanta, Georgia 30303
                                            (404) 659-4628

## **CERTIFICATE OF SERVICE**

This is to certify that I have this day served a copy of the within and foregoing pleading using the Court's CM/ECF system which will deliver a copy to all registered to receive service via CM/ECF, addressed as follows:

>Laura Boatwright, AUSA
>Office of the United States Attorney-ATL600
>Northern District of Georgia
>600 United States Courthouse
>75 Ted Turner Dr., SW
>Atlanta, GA 30303

This 9th day of July 2020.

>/s/ Bruce S. Harvey
>LAW OFFICE OF BRUCE S. HARVEY
>ATTORNEY FOR DEFENDANT
>Bruce S. Harvey, #335175
>bruce@bharveylawfirm.com
>146 Nassau Street, NW
>Atlanta, Georgia 30303
>(404) 659-4628