IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 1:20-cr-00058-JPB-RDC |
| vs. | |
| IVAN VAN BEVERHOUDT, | |
| Defendant. | |

### DEFENDANT'S POST-HEARING MEMORANDUM OF LAW

Defendant **IVAN VAN BEVERHOUDT**, through counsel, submits this Post-Hearing Memorandum of Law in support of his Motion to Suppress.

### FACTS

**A. Background**

On January 10, 2020, Defendant Van Beverhoudt, a U.S. Customs and Border Patrol CPB agent, took a flight from the St. Thomas, U.S. Virgin Islands to Atlanta, with an ultimate destination of Baltimore, Maryland. When the flight arrived at the Atlanta airport, CPB officers at the Atlanta airport met the flight to conduct an inspection and search for contraband being carried by a passenger other than Van Beverhoudt. (Tr. 75).

### B. CBP Officers Seize Van Beverhoudt at the Atlanta Airport, Question Him Without Miranda Warnings

#### 1. CBP Officers Seize and Question Van Beverhoudt in the Jetway Without Giving Miranda Warnings

Two Atlanta-based CBP officers stood in the jetway adjacent to the aircraft door. Another CBP officer stood in the jetway with a drug detection dog halfway between the door to the aircraft and the entrance to the terminal. Van Beverhoudt exited the aircraft pulling a red-roller bag that he believed belonged to him and carrying a black laptop bag.

The disembarking passengers passed by a drug-detection dog in the jetway. The CBP officer with the canine stood on the right side of the jetway facing the disembarking passengers, with the dog on his left side. (Tr. 27). As the passengers disembarked, they traveled up the jetway past the dog. *Id.* According, the CBP canine officer, the dog alerted after Van Beverhoudt walked past the dog. (Tr. 29–30, 80–81). The CBP officer issued a "command" to Van Beverhoudt to stop. (Tr. 81). At that point, CBP officers detained Van Beverhoudt, walked with him back to the aircraft door where other CBP officers were standing, and ordered him to wait in the jetway with those officers until the rest of the passengers on the flight disembarked. (Tr. 84).

All of the officers were armed with a weapon, tasers, batons, handcuffs, and dressed in full uniform, including body armor. (Tr. 87, 171–172). CBP

officers forced Van Beverhoudt to wait at least 15 minutes in the jetway and questioned him while he was waiting. (Tr. 92).

There is no dispute that the CBP officers were conducting a criminal inquiry. (Tr. 92).  None of the CBP officers told Van Beverhoudt that he wasn't under arrest, nor did they inform him that he was free to leave even though they were in possession of luggage they believed belonged to him. (Tr. 88). The other passenger was detained despite the fact that the dog had not alerted to him or his luggage. (Tr. 41).

### 2. CBP Officers Transfer Van Beverhoudt from the Jetway to a Small Conference Room Near Terminal F-3 and Continue Interrogating Him

Van Beverhoudt was detained and forced to wait in the jetway while all of the other passengers and crew de-planed. (Tr. 182:16–20). Van Beverhoudt and another passenger who had been the subject whom CBP had identified as the reason for the inspection of the flight were then directed to a small interview room with the CBP officers. The room in the airport was no more than 10 by 10 feet. (Tr 184:8–14).  At least 5–6 armed law enforcement officers in uniform came in and out of the interview room. (Tr. 94, 98). The small interview room was guarded by several other armed CBP officers and other armed law enforcement. (Tr. 94).

None of the officers who guarded the small room and none of the officers who came in and out of the small room told Van Beverhoudt that he was not

under arrest. None of the officers outside or inside the small room told Van Beverhoudt that he was free to leave, nor did they tell him he wasn't required to answer their questions. (Tr. 94–95, 190–191, 197). In fact, Van Beverhoudt was not free to leave at any time. (Tr. 192).[1]

### 3. CBP Officers Transfer Van Beverhoudt from the Room at Terminal F-3 to the "Terminal F Interview Room," a Restricted Area in the Baggage Inspection Area Where They Continue to Interrogate Him

After questioning Van Beverhoudt in the small conference room at Terminal F-3 for a substantial period of time about his travel, CBP Officers transfer Van Beverhoudt to the "Terminal F Interview Room," an area in the baggage inspection area in which access is limited to law enforcement personnel. (Tr. 192:18–25). CBP Officers walked with Van Beverhoudt to the second interview room, and continued to interrogate him about the luggage and Van Beverhoudt's travel plans and the reasons for travel. Van Beverhoudt was not free to leave and CBP Officers even escorted him to the bathroom. (Tr. 193:7–9). At no time during the interrogation in the restricted area did CBP Officers give Van Beverhoudt *Miranda* warnings.

An officer searched the side pocket of the black laptop bag and located some keys and Van Beverhoudt's U.S. Passport. During the search, the agents

---

[1] CBP officers released the other passenger after finding a large amount of money but no contraband. (Tr.

confiscated two cellular phones in Van Beverhoudt's bags. Van Beverhoudt was not free to leave the second interview room. None of the officers present outside or inside the second interview room told Van Beverhoudt he was free to leave.

At that point, CBP Officers opened the luggage they believed belonged to Van Beverhoudt and discovered fourteen packages of cocaine. (Tr. 60). The officers placed Van Beverhoudt in handcuffs and found two packages of cocaine in a briefcase that allegedly belonged to Van Beverhoudt. CBP officers escorted Van Beverhoudt to a third interview room where he was finally advised of, and waived, his *Miranda* and *Garrity* rights, by agents with the Department of Homeland Security Investigations (HSI) and DHS Office of the Inspector General. The interrogation which followed is the only questioning that was done under the *Miranda* and *Garrity* warnings.

## ARGUMENT

### A. Individuals Detained by Law Enforcement are Entitled to Miranda Warnings Before Custodial Interrogation

Individuals confronted by law enforcement at the border are entitled to *Miranda* warnings before custodial interrogation. *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996). Whether a defendant was in custody is a mixed question of law and fact. *Id.* The standard is objective and the question for the court is whether "under the totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of

movement to such extent that he would not feel free to leave." *Id.* The actual —that is, the actual— beliefs of the officer and the defendant are irrelevant as is the question of whether the suspect "knows he is guilty and believes incriminating evidence will soon be discovered…" *Id.* The Supreme Court's formulation of the question is whether the restrictions on a suspect's freedom are the "degree associated with formal arrest." *Id.* (citing *Minnesota v. Murphy*, 465 U.S. 420, 430, 104 S. Ct. 1136, 1144, 79 L. Ed. 2d 409 (1984)).

Whether the suspect (1) was restrained or confined during the interview, (2) physically moved, (3) handcuffed; (3) was told of formal accusations, or told that he was under arrest, (4) was told that he was not free to do so, and (5) made admissions during the interview that would have led a reasonable person in his place to conclude that he would be arrested immediately.

### B. The Circumstances of Van Beverhoudt Detention Establish That He Was In Custody

The test is objective from the perspective of a reasonable innocent person: meaning that the actual, subjective beliefs of the defendant and the interviewing officer about whether the defendant was free to leave are irrelevant, as is whether a defendant knows he is guilty and believes incriminating evidence will soon be discovered. *United States v. Soleimani*, No. 2019 U.S. Dist. LEXIS 198576, *43–•44 (N.D. Ga. 2019) (citations

omitted). The trial court must "consider several factors in determining custody, 'including whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled.'" *Soleimani*, 2019 U.S. Dist. LEXIS 198576, at *44. In this case, all of the factors establish that Van Beverhoudt was in custody. The officers were in uniform, carried tasers, handcuffs, and weapons. The officers restrained Van Beverhoudt's movement, used unmistakable language to make it clear he was not free to leave, confined Van Beverhoudt to at 10 x 10 room, subjected him to confinement and questioning for hours, and even went the extreme measure of accompanying him to the bathroom.

In *Soleimani*, this Court held that a defendant is in custody where, as here, the defendant is taken into a 10 x 10 room in the airport by armed, uniformed and non-uniformed officers and asked about her destination, the purpose of her trip, whether she had any checked baggage" and the items in her luggage. *Soleimani*, No. 2019 U.S. Dist. LEXIS 198576, *35. The length and degree of confinement, the statements and actions of the officers, and the nature of the questioning are far more indicative of a custodial, coercive environment than the brief detention of the defendant in *Soleimani*.

### C. CBP Officers Did Not Provide Miranda Warnings Prior to Interrogating Van Beverhoudt in the Jetway, Terminal F-3 or Terminal F Interview Room

In addition to establishing that he was in custody, a defendant must also prove that he was subjected to interrogation. In this context "[i]nterrogation refers to both express questioning and it. 'functional equivalent,' which includes 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" 781 F.3d 13, 23 (1ˢᵗ Cir. 2015)(quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980))  In other words, because of the overriding power and responsibility of the sovereign to police national borders, the fifth amendment guarantee against self-incrimination is "not offended by routine questioning of those seeking entry to the *United States." Lueck*, 678 F.2d at 899.

For this reason, "some degree of questioning and of delay is necessary and is to be expected at entry points into the United States." *Moya*, 74 F.3d at 1120. And "questioning at the border must rise to a distinctly accusatory level before it can be said that a reasonable person would feel restraints on his ability to roam to the degree associated with formal arrest." *Id.*; *see also Soleimani*, 2019 U.S. Dist. LEXIS 198576 (N.D. Ga. Sep. 25, 2019)

This court must consider several factors to determine whether, under these circumstances, the border interrogations of Van Beverhoudt "rise to an

accusatory level." *United States v. Charles*, 2010 U.S. Dist. LEXIS 24317, *8 (N.D. Ga. 2010)(citing Moya, 74 F.3d at 1119). These factors include whether the arrestee was physically moved or restrained by officers during the interview, whether the suspect asked to leave; whether an officer told the suspect that he could not leave, etc. *Id.* Here, the officers physically restrained Van Beverhoudt to the point where he could not leave or even use the restroom without being accompanied by an officer. The officers confined Van Beverhoudt to the jetway, a small room, then an interview room and, finally, another interview room. The officers testified that Van Beverhoudt was not free to leave at any time and went beyond the routine questions that normally take place at the border. The questioning of Van Beverhoudt by several uniformed, armed officers under these circumstances was inherently and unquestionably coercive.

**WHEREFORE**, Van Beverhoudt requests that this Court enter an order suppressing all of the statements made by him prior to the *Miranda* warnings given to him at the third location where he was interrogated.


Date:  3 December 2021.          By: **/ Bruce S. Harvey**
                                       Bruce S. Harvey
                                       Ga. Bar No. 33575

                            By: **s/ Stephen M. Katz**
                                 Stephen M. Katz
                                 Ga. Bar No. 409065

**LAW OFFICE OF BRUCE S. HARVEY**
146 Nassau Street
Atlanta, Georgia 30303-2010
Telephone: 404.659.4628
Email: bharvey@bharveylawfirm.com